**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

|  |  |
|---|---|
| LEAGUE OF WOMEN VOTERS OF FLORIDA, INC.; LEAGUE OF WOMEN VOTERS OF FLORIDA EDUCATION FUND, INC.; and FLORIDA STATE CONFERENCE OF BRANCHES AND YOUTH UNITS OF THE NAACP, |  |
| *Plaintiffs*, | Case No. 4:23-cv-165 |
| v. |  |
| CORD BYRD, in his official capacity as Florida Secretary of State, |  |
| *Defendant*. |  |

**COMPLAINT**

1.      Plaintiffs, the League of Women Voters of Florida and the Florida State Conference of the NAACP, bring this lawsuit, pursuant to 52 U.S.C. § 20510(b), to challenge Florida's uniform statewide voter registration application (the Application) (annexed as **Exhibit 1**) and to vindicate their rights and those of their members and constituents under the NVRA.

2.      The right to vote is fundamental. To ensure all eligible American citizens can exercise that right, Congress enacted the National Voter Registration Act of 1993 (NVRA), 52 U.S.C. § 20501 *et seq.*, laying out basic minimum standards for voter registration in federal elections—a floor below which states cannot fall.

Congress' aims were clear: increasing the number of eligible citizens who register to vote and exercise their voting rights, and ensuring that state governments promote, rather than impede, those rights.

3.     The State of Florida has chosen to defy that law. Florida enacted a byzantine statutory scheme for the restoration of voting rights following felony convictions that made it "sometimes hard, sometimes impossible" for returning citizens (Floridians with past felony convictions) to determine their eligibility to vote. *See Jones v. DeSantis*, 462 F. Supp. 3d 1196, 1241 (N.D. Fla. 2020), *rev'd in part and vacated in part sub nom. Jones v. Governor of Fla.*, 975 F.3d 1016 (11th Cir. 2020) (*en banc*). The Application, which fails to meet the NVRA's basic minimum standards for informing potential voters about Florida's complicated eligibility requirements, 52 U.S.C. § 20507(a)(5)(A) (general requirements), made an already grave situation worse for people across Florida.

4.     State mail-in registration applications for federal elections must "include a statement that [] specifies each eligibility requirement." *See id.* §§ 20505(a)(2) (requiring state mail voter registration forms satisfy the criteria in Section 20508(b)), 20508(b)(2)(A) (requiring that mail voter registration forms contain a statement that "specifies each eligibility requirement").

5.     The Application does not comply with these statutory mandates.

6.     The Application does not specify *any* specific eligibility requirements

2

related to prior criminal convictions.

7.      The Application says only that, "[i]f you have been convicted of a felony . . . you cannot register until your right to vote has been restored."

8.      The Application also requires applicants to check a box stating "I affirm that I am not a convicted felon, or if I am, my right to vote has been restored."

9.      But the Application does not provide any explanation as to when an individual's "right to vote has been restored," or any guidance for a voter seeking to make that determination.

10.     The Application fails to inform voters that the eligibility requirements differ depending on a returning citizen's conviction, the state of conviction, and the sentence received. The Application does not:

- Specify that for most felonies in Florida, returning citizens' rights are automatically restored upon completion of all terms of their sentence, including probation, parole, or community control and payment of certain legal financial obligations (LFOs);

- Specify that returning citizens convicted of murder or felony sexual offenses in Florida can *only* have their rights restored through the clemency process; or

- Specify that the voting rights of returning citizens convicted of felonies in states other than Florida are restored according to the law of the convicting state.[1]

---

[1]      This is despite the fact that the Division of Elections has declared that a "felony conviction in another state makes a person ineligible to vote in Florida only if the conviction would make the person ineligible to vote in the state where the person was convicted." *Constitutional Amendment 4/Felon Voting Rights*, FLA. DIV.

11.    In these many ways, the Application fails to adequately inform applicants about Florida's voter-eligibility requirements and violates the NVRA.

12.    Due to the State's NVRA violation and maze of voter-eligibility rules, returning citizens struggle to accurately complete the Application and voter-registration organizations struggle to assist returning citizens in answering the Application.

13.    Over the last five years, Florida changed its voter eligibility rules for returning citizens significantly. But the Application, which the State adopted in 2013, does not account for these changes.

14.    In 2018, a supermajority of Florida voters amended Florida's constitution to end the State's policy of lifetime disenfranchisement for most returning citizens.

15.    An estimated 1.4 million Floridians with non-disqualifying felony convictions expected to regain their right to vote due to this historic ballot initiative, known as Amendment 4.

---

OF ELECTIONS, https://dos.myflorida.com/elections/for-voters/voter-registration/constitutional-amendment-4felon-voting-rights/ (last visited Apr. 25, 2023); *see also* Dep't of State Advisory Op. 04-05 (May 27, 2004) ("Those persons convicted of felonies outside of Florida whose voting rights were restored by the state wherein the felony was committed, may register to vote in Florida. No evidence of the civil rights restoration is required at the time of registration."). It appears, although the State has nowhere confirmed, that this rule applies to out-of-state federal convictions as well.

16.     In response to the single largest expansion of voting rights since the U.S. Constitution was amended in 1971, Florida enacted Senate Bill 7066 (SB 7066) in 2019. SB 7066 created a pay-to-vote system that effectively revoked the eligibility of nearly half of the intended beneficiaries of Amendment 4—more than 774,000 returning citizens who owe certain court-imposed debts that they cannot afford to pay. This pay-to-vote system has been an "administrative train wreck." *Jones*, 462 F. Supp. 3d at 1239.

17.     Because of Florida's complex voter-eligibility rules and its inability to inform returning citizens whether they owe disqualifying LFOs, it is "sometimes hard, sometimes impossible" for returning citizens to determine whether they are eligible to vote. *Id.* at 1241.

18.     The State's inability to administer its complex eligibility rules—many of which SB 7066 created or exacerbated—has resulted in, and will continue to cause, tragic consequences.

19.     Within the last 13 months alone, the State prosecuted at least 39 returning citizens for registering to vote or voting while allegedly ineligible to do so. The available evidence reflects that most if not all of these returning citizens honestly believed themselves to be eligible to register and vote.

20.     For several of these returning citizens, a government official advised them to register or told them they could vote.

21.    Most if not all returning citizens that the State prosecuted received an official voter information card in the mail. *See* Fla. Stat. § 97.071(1).

22.    Florida's voter information card "constitutes notice of approval of registration." *Id*.

23.    In other words, the State arrested and prosecuted dozens of returning citizens (most of whom are Black) in the face of objective circumstances that would cause any reasonable person to honestly believe in his or her eligibility to register and vote.

24.    These returning citizens faced or are facing felony charges, punishable by up to five years in prison and $5,000 in additional court-imposed fines.

25.    Florida's Office of Statewide Prosecution (OSP) brought about half of these cases.

26.    OSP prosecuted these cases even though in previous litigation before this Court and the Eleventh Circuit Court of Appeals, Florida repeatedly promised that it would not prosecute cases in which returning citizens made "good faith, but mistaken" decisions about their eligibility and emphasized the importance of the willfulness *mens rea* element in Florida's voter fraud statutes.[2]

---

[2]    *See, e.g.*, Opposition to Application to Vacate the En Banc 11th Circuit's Stay at 52, *Raysor v. DeSantis*, 140 S. Ct. 2600 (2020) (No. 19A1071) [tinyurl.com/2p8d27u8]; En Banc Opening Brief of Defendants-Appellants at 74, 75, *Jones v. Governor of Fla.*, 975 F.3d 1016 (11th Cir. 2020) (No. 20-12003) [tinyurl.com/

27.     Relying in part on these representations from the State, the Eleventh Circuit emphasized that no returning citizen who "honestly believes he has completed the terms of his sentence commits a crime by registering and voting[.]" *Jones v. Governor of Fla.*, 975 F.3d 1016, 1048 (11th Cir. 2020).

28.     Despite these representations, Florida appears to have adopted a policy of prosecuting returning citizens for good-faith mistakes.

29.     The State's Application makes matters worse. It increases the risk that a returning citizen will be investigated, prosecuted, and re-ensnared in the criminal system. Specifically, the Application requires applicants to affirm their eligibility without providing them with the information they need to make that determination, or the guidance they require to accurately complete the form.

30.     Plaintiffs therefore ask this Court to: (1) declare that the Application violates the NVRA; (2) enjoin the Secretary of State from using the Application; and (3) order the Secretary of State to develop a new application that complies with the NVRA.

## I.  THE PARTIES

### A.     Plaintiffs

31.     **Plaintiffs League of Women Voters of Florida, Inc. and League of**

---

cbxhsctw]; En Banc Reply Brief of Defendants-Appellants at 68, *Jones*, 975 F.3d 1016 (No. 20-12003) [tinyurl.com/9jaj99kj].

**Women Voters of Florida Education Fund, Inc.**, formed under Section 501(c)(3) and Section 501(c)(4) of the Internal Revenue Code, respectively **(collectively, the League)** are the Florida affiliate of the League of Women Voters of the United States (LWVUS). The League is a nonpartisan, voter-focused, grassroots nonprofit organizations.

32.     The League has 29 chapters across the State of Florida, from Pensacola to the Keys. The League has thousands of members and an even greater number of supporters and volunteers, all of whom receive regular communications from the League. The League also serves non-member Floridians.

33.     The League's mission is to encourage informed and active participation of citizens in government. Among other activities, the League educates citizens about their voting rights and facilitates voting, including through get-out-the-vote (GOTV) efforts and registration drives. For over 84 years, the League has dedicated substantial resources and effort to increasing voter registration and civic participation among the Floridians it serves.

34.     The League's national arm, LWVUS, is the nation's largest and longest-standing grassroots voter registration organization, registering hundreds of thousands of voters nationwide each year. It has engaged in GOTV efforts since 1920 and has long supported state and federal legislation that increases voter registration opportunities for eligible voters. In 1993, then-president of the LWVUS, Becky

Kain, stood behind President Bill Clinton as he signed the NVRA and delivered remarks in support of the landmark legislation.

35.    The League advocated for the passage of Amendment 4, lobbied against the passage of SB 7066 while the Florida Legislature debated it, and sued in *Gruver v. Barton*, Case No. 1:19-cv-121 (N.D. Fla.), a federal lawsuit challenging SB 7066 as unconstitutional and violative of the NVRA.

36.    As part of its core mission to empower voters and defend democracy in Florida, the League created a vigorous program to reach and register eligible returning citizens across the state. This program employs three interrelated principal strategies to promote the full participation of returning citizens in civic society: (1) educating returning citizens about their rights; (2) training volunteer attorneys through two League-created and Florida Bar-approved continuing legal education (CLE) courses to provide free legal services to returning citizens who need assistance to determine or assert their eligibility to vote; and (3) organizing a statewide volunteer outreach program to assist returning citizens with navigating the voter registration process.

37.    Prior to the 2020 general election, the League trained 1,000 volunteer attorneys to provide free legal services to returning citizens statewide. It also sent postcards to over 200,000 returning citizens across the state who it believed had no outstanding disqualifying LFOs, informing them of their possible eligibility to vote.

38.    The League's success in reaching and registering returning citizens depends on its ability to assist applicants in accurately completing voter registration forms, including applicants' oath or affirmation as to their eligibility.

39.    The League has found that returning citizens are often confused about their eligibility to vote because of Florida's: (1) failure to provide sufficient information on the Application about the voter eligibility requirements that apply to people with felony convictions; (2) complex system for identifying outstanding LFOs and determining whether they disqualify someone from registering or voting; and (3) refusal to tell people about their eligibility to register or vote, including those with out-of-state or federal convictions.

40.    The League also observed that applicants are unsure about how to properly fill out their voter registration applications, and regularly complete their applications based on a good-faith belief in their eligibility.

41.    Volunteers in the League's statewide outreach program: (1) discuss the value of voting, collective action, and civic engagement; (2) inform returning citizens and re-entry groups about Florida's voter qualifications and how one may determine one's eligibility or seek restoration of one's rights based on available information; and (3) encourage active participation in government and the political process, including by registering to vote.

42.    Defendant's ongoing NVRA violation forces the League to divert its

limited resources away from its other voter education, registration, and GOTV programs—such as youth and new citizen programs. Instead, the League must direct its resources toward educating returning citizens—and League volunteers who help them register—about Florida's eligibility requirements and helping them to understand the Application.

43.     But for the Application's failure to effectively inform returning citizens about their eligibility, the League would not have had to divert resources to: (1) updating its CLE courses for volunteer attorneys who assist returning citizens with using the Application to register to vote; (2) developing and implementing a new volunteer training program on Florida's eligibility requirements, including how to determine a returning citizen's eligibility; and (3) retraining existing volunteers and recruiting additional volunteers to staff this program.

44.     In parallel, the Application forces the League to expend more time seeking to determine the eligibility of Florida citizens that it assists with voter registration. That expenditure is directly attributable to the Application's failure to state with specificity or clarity the state's voter eligibility requirements for returning citizens.

45.     For similar reasons, the confusion and uncertainty that the Application engenders forces the League to spend more time and resources identifying volunteers for its statewide voter registration program. Fewer volunteers have the

necessary expertise or willingness to parse eligibility requirements that the Application never lays out.

46.    The League is concerned that by registering returning citizens using the Application, the League will expose itself, its volunteers, and the returning citizens it serves to criminal liability for inadvertent errors.

47.    As a result of the misleading information in the Application and the persistent threat of prosecution for good-faith mistakes, some of the League's board members have expressed reservations about continuing to operate a statewide voter-registration program. Some League volunteers have also declined to participate in efforts to register returning citizens. The League and its volunteers also are chilled by the State's ongoing investigations, arrests, and prosecutions of returning citizens for good-faith errors under Fla. Stat. §§ 104.011 (false swearing; submission of false voter registration information) and 104.15 (unqualified electors willfully voting). And the State's reported investigation of third-party voter registration organizations and their members for allegedly registering ineligible returning citizens deters the League and its volunteers as well.

48.    The threat to third-party voter registration organizations is real and imminent, as evidenced by Defendant's statements and new legislation that increases criminal fines for such organizations. For instance, at a September 14, 2022 hearing before the U.S. Commission on Civil Rights, Defendant Byrd publicly expressed his

belief that organizations helping returning citizens to register to vote are engaged in misconduct: "I do believe there are some organizations either well-meaning or intentionally engaging in the unauthorized practice of law by advising people of things that may or may not be accurate. As the federal court that reviewed Amendment Four and ruled on it ultimately stated, it's up to the individual registering to know whether or not they are eligible."

49.    Additionally, the first report that the DOS's new Office of Election Crimes and Security (OECS) released demonstrates that it is actively investigating third-party voter registration organizations. *See* Fla. Dep't of State, Off. of Election Crimes and Sec. Rep., at 5 (Jan 15, 2023), https://files.floridados.gov/media/706232/dos-oecs-report-2022.pdf.

50.    And at a press conference on or about September 7, 2022, Governor DeSantis commented: "[I]f you have like a third-party group or someone telling somebody yeah you know you're a convicted rapist but you can vote. That obviously is false and that may expose some of those groups to liability because clearly if you're involved in some type of voter mobilization, you know what the law is or not what the law is and if you're doing that you're making a conscious decision to evade the law."

51.    The League seeks to protect and advance the interests of a particular community (returning citizens), and the Application injures that community.

Defendant's ongoing NVRA violations have therefore made and continue to make it substantially more difficult for the League to fulfill its civic-engagement mission and have adversely impacted and continue to adversely impact the League's operations.

52.   **Plaintiff Florida State Conference of Branches and Youth Units of the NAACP (Florida NAACP)** is a nonpartisan, nonprofit membership and civil rights organization in Florida.

53.   The Florida NAACP is a state conference of branches of the National Association for the Advancement of Colored People (NAACP).

54.   The NAACP was formed in 1909 to remove all barriers of racial discrimination through democratic processes and through the enactment and enforcement of federal, state, and local laws securing civil rights, including laws relating to voter registration. The NAACP advocated for the passage of the NVRA, and, in 1993, then-executive director Benjamin Chavis spoke at the legislation's signing ceremony and stood with President Bill Clinton as he signed it into law.

55.   The Florida NAACP is the oldest civil rights organization in Florida, and serves as the umbrella organization for local branches throughout the state, which themselves are membership organizations. Members of the local branches are also members of the Florida NAACP.

56.   The Florida NAACP advocated for the passage of Amendment 4, lobbied against the passage of SB 7066 while it was being debated by the Florida

Legislature, and was one of the plaintiffs in *Gruver v. Barton*, a federal lawsuit challenging SB 7066 as unconstitutional and violative of the NVRA.

57.   The Florida NAACP's approximately 12,000 members are predominately Black individuals and include registered voters who reside throughout the state. Some members of the Florida NAACP and its local branches are returning citizens. The Florida NAACP also serves non-member constituents throughout the state, including non-member returning citizens.

58.   For decades, the Florida NAACP has invested in statewide voter registration and has been credited with the registration of thousands of Florida voters. The Florida NAACP has also engaged in public education on the political and electoral processes, voter protection on election days, and advocacy for the right to vote, all to encourage civic and electoral participation among its members and other non-member voters it serves.

59.   Among the constituents the Florida NAACP serves with its GOTV and voter registration work are returning citizens. Following the passage of Amendment 4, the Florida NAACP planned to engage in a significant voter-registration campaign focused specifically on newly eligible returning citizens across the state; however, the Florida NAACP's success in reaching and registering returning citizens depends on its ability to assist applicants with accurately completing voter registration forms, including the applicant's oath or affirmation as to their eligibility.

60.     The Florida NAACP has found that returning citizens are often confused about their ability to vote because of Florida's (1) failure to provide sufficient information on the Application about the voter-eligibility requirements that apply to people with felony convictions; (2) complex system for ascertaining the existence of outstanding LFOs and determining whether they disqualify one from registering or voting; and (3) refusal to inform applicants about their eligibility to register or vote, including those with out-of-state convictions.

61.     The Florida NAACP has found that applicants are unsure about how to properly fill out their voter registration applications, and may complete their applications based on good-faith belief in their eligibility.

62.     The Florida NAACP dedicates substantial resources to educate the public about the political and electoral process and to increase civic participation with its GOTV and voter-registration programs. Among the constituents the Florida NAACP serves with its GOTV and voter registration work are returning citizens. The Florida NAACP, through its local branches, organizes know-your-voting-rights trainings and voter-registration drives to assist returning citizens with determining their eligibility and completing voter registration applications.

63.     Defendant's ongoing NVRA violation has forced the Florida NAACP to divert its limited resources away from its core mission of promoting voting and investing in GOTV efforts and toward educating returning citizens about the

Application's requirements based upon information available to the organization.

64.     But for the Application's deficiencies in informing returning citizens about their eligibility, the Florida NAACP would not have had to divert resources to: (1) organize know-your-voting-rights trainings and voter registration drives to assist returning citizens with determining their eligibility and completing voter-registration applications; (2) develop new training materials for volunteers and new public-education information; (3) coordinate additional resources, such as lawyers, to assist with voter education and field increased inquiries from returning citizens about their right to vote; and (4) change statewide voter and election protection activities beyond Election Day to include the period before and after elections to assist constituents with the sometimes lengthy process of determining their eligibility.

65.     Florida NAACP member-volunteers also must spend more time seeking to determine the eligibility of Florida citizens they assist with voter registration because the Application fails to state, with any specificity or clarity, the State's voter-eligibility requirements for returning citizens.

66.     The Florida NAACP has cancelled events and voter-registration activities to devote additional time and resources to educating voters, its local branches, and other partners about the increased risks of registering to vote, including because of the complexities surrounding determining eligibility.

67.    Florida NAACP leadership and members who previously conducted robust voter-registration activities, specifically geared towards returning citizens whose rights were restored by Amendment 4, have been deterred from participation for fear of inadvertently registering someone in error.

68.    The Florida NAACP is concerned that by registering returning citizens using the Application, it will expose returning citizens to criminal liability. The Florida NAACP also is concerned that by engaging in voter-registration activities specifically geared towards returning citizens, it will be exposing returning citizens, some of whom include its members, to criminal liability for inadvertent errors.

69.    These concerns are not speculative, given the State's ongoing investigations and prosecutions of returning citizens for good-faith errors under Fla. Stat. §§ 104.011 (false swearing; submission of false voter registration information) and 104.15 (unqualified electors willfully voting). At the same time, the State is reportedly investigating third-party voter-registration organizations and their members for allegedly registering ineligible returning citizens.

70.    Florida NAACP seeks to protect and advance the interests of a particular community (returning citizens), and the Application injures that community. Defendant's ongoing NVRA violations have therefore made it substantially more difficult for the Florida NAACP to engage in its civic-engagement mission and adversely impacts its operations.

**B.     Defendant**

71.     **Defendant Cord Byrd** is sued in his official capacity as Florida's Secretary of State (SOS), the State's "chief election officer." Fla. Stat. § 97.012.

72.     It is the duty of his Department of State (DOS) to "prescribe by rule a uniform statewide voter registration application for use in this state." Fla. Stat. § 97.052; *see also* Fla. Admin. Code 1S-2.040.

73.     As Florida's chief election officer, the Secretary must "[c]oordinate the state's responsibilities under the National Voter Registration Act of 1993." Fla. Stat. § 97.012(7).

74.     The Secretary is also responsible for "[e]nsur[ing] that all registration applications and forms prescribed or approved by [DOS] are in compliance with . . . the National Voter Registration Act of 1993." *Id.* § 97.012(9).

75.     The Secretary is responsible for ensuring the State's compliance with all election laws. *See Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318 (11th Cir. 2019) ("Because the Secretary is the state's chief election officer with the authority to relieve the burden on Plaintiffs' right to vote, she was appropriately sued for prospective injunctive relief.") (*citing* Fla. Stat. § 97.012); *see also Ex parte Young*, 209 U.S. 123 (1908) (permitting injunctive relief against individual state officers in their official capacities).

76.     A state's chief election officer is responsible for "coordination of State

responsibilities" under the NVRA, 52 U.S.C. § 20509, and must make voter registration forms available for distribution through governmental and private entities, *id.* § 20505(b).

## II.  JURISDICTION AND VENUE

77.    Plaintiffs bring this action under 52 U.S.C. § 20510(b) to redress Defendant's violations of the NVRA.

78.    On January 13, 2023, Plaintiffs' counsel and Plaintiffs served a 90-day notice letter pursuant to 52 U.S.C. § 20510(b)(2) on Defendant. The letter is attached to this Complaint as **Exhibit 2**. On April 12, 2023, Plaintiffs' counsel received a response from Joseph S. Van de Bogart, General Counsel for the Florida Department of State. Mr. Van de Bogart wrote that "[t]he Florida Department of State . . . is reviewing [Plaintiffs'] proposed recommendations to the Florida Voter Registration Application." The letter is attached to this Complaint as **Exhibit 3**. But the response letter did not address the concerns Plaintiffs' counsel and Plaintiffs outlined; nor did it outline any proposed actions to specifically address those concerns in the future. As of today—more than 90 days since Plaintiffs sent the letter—the violations Plaintiffs identified within that letter have not been cured.

79.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the laws of the United States and because Plaintiffs bring this action to redress the

deprivation, under color of state law, of rights, privileges, and immunities secured by federal law.

80.    This Court has the authority to provide the emergency declaratory and injunctive relief that Plaintiffs seek pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure, 28 U.S.C. §§ 2201 and 2202, and 52 U.S.C. § 20510(b)(2).

81.    Venue is proper in this Division and District under 28 U.S.C. § 1391(b) and Local Rule 3.1(A)–(B) because Defendant resides in and a substantial part of the events or omissions giving rise to the claim occurred in this Division and District.

### III.   FACTUAL ALLEGATIONS

### C.    Florida's History of Disenfranchisement, Amendment 4, and SB 7066.

82.    From the 1860s to 2018, Florida's constitution permanently banned returning citizens from voting unless the Florida Board of Executive Clemency had restored their voting rights.

83.    The ban had racist roots and a racially discriminatory impact.

84.    Following the Civil War, Florida initially limited the right to vote to free white males.

85.    After Congress mandated that Florida adopt a constitution that did not expressly discriminate on the basis of race, Florida permanently banned anyone with a felony conviction from voting.

86.    Combined with "'Black Codes' that upped the penalties for charges that

were easy to pin on freed blacks," "[f]elony disenfranchisement was a way of reducing the effect of the despised black suffrage that [Florida lawmakers] knew they had no alternative but to accept." Timothy Elfrink, *The Long, Racist History of Florida's Now-Repealed Ban on Felons Voting*, WASH. POST (Nov. 7, 2018) https://www.washingtonpost.com/nation/2018/11/07/long-racist-history-floridas-now-repealed-ban-felons-voting/ (*quoting* Jerrell H. Shafer, *The Constitution of 1868*, FLA. HISTORICAL QUARTERLY, Vol. XLI, No. 4 (April 1963), https://ucf.digital.flvc.org/islandora/object/ucf%3A22393/).

87.     Felony disenfranchisement limited Black people's suffrage: as of 1940, as little as 3 percent of Black Floridians were registered to vote; in 2016, although Black people comprised 16 percent of Florida's population, they made up 33 percent of all those disenfranchised because of a felony conviction.

88.     As of November 2016, more than 20 percent of Florida's Black voting-age residents could not vote. *Hand v. Scott*, 285 F. Supp. 3d 1289, 1310 (N.D. Fla. 2018), *vacated and remanded sub nom. Hand v. DeSantis*, 946 F.3d 1272 (11th Cir. 2020).

89.     Florida's clemency regime contributes to this disenfranchisement. Before Amendment 4, a person's ability to have their civil rights restored depended entirely upon the unfettered discretion of the governor and other members of Florida's Board of Executive Clemency. FLA. CONST. art. IV, § 8; *see also* Fla. R.

Exec. Clemency 4. Success under this system has been exceedingly rare, without articulated standards, and largely illusory for Black returning citizens. *See Hand*, 285 F. Supp. 3d at 1302, 1310.

90.    By 2016, nearly one out of every four people disenfranchised in the United States lived in Florida. Florida also disenfranchised a higher percentage of its citizens—of all races—than any other state. As of November 2016, nearly 1.7 million Floridians—"[m]ore than *one-tenth* of Florida's voting population"—were disenfranchised because of a felony conviction. *Hand*, 285 F. Supp. 3d at 1310. Nearly 1.5 million of those disenfranchised had completed the custodial terms of their sentences.

91.    In 2018, nearly two-thirds of Florida's voters approved Amendment 4, voting to end the permanent disenfranchisement of returning citizens.

92.    Amendment 4 added the following language to Article VI, Section 4(a) of the Florida Constitution:

> Except as provided in subsection (b) of this section, any disqualification from voting arising from a felony conviction shall terminate and voting rights shall be restored upon completion of all terms of sentence including parole or probation.

Subsection (b) provides:

> No person convicted of murder or a felony sexual offense shall be qualified to vote until restoration of civil rights.

93.    As the Florida Supreme Court explained, the "chief purpose of the

amendment is to automatically restore voting rights to felony offenders, except those convicted of murder or felony sexual offences, upon completion of all terms of their sentence." *Advisory Op. to the Att'y Gen. Re: Voting Restoration Amend.*, 215 So. 3d 1202, 1208 (Fla. 2017).

94.     Amendment 4 became effective on January 8, 2019.

95.     Shortly after Amendment 4 went into effect, Florida's Legislature and Governor Ron DeSantis enacted SB 7066, amending Florida's election laws to prevent returning citizens whose rights were restored by Amendment 4 from registering and voting until they have paid certain LFOs, namely, all "fines, fees, costs, and restitution" within the "four corners" of their "sentencing document." Laws of Fla. ch. 2019-162 (CS for SB 7066), § 25 at 28 (creating Fla. Stat. § 98.0751(1), (2)(a)). The law was effective on July 1, 2019.

96.     SB 7066 also defined the terms "murder" and "felony sexual offense," for which voting rights are not automatically restored by Amendment 4, to include a list of Florida criminal code sections and any "similar offense committed in another jurisdiction." Fla. Stat. § 98.0751(2)(b)–(c).

97.     In 2019, a group of returning citizens and organizations, including Plaintiffs the League and the Florida NAACP, brought suit in this Court challenging SB 7066 as an unconstitutional "pay-to-vote" scheme and presenting a challenge under the NVRA to the voter registration application that Florida adopted in 2019

after passage of SB 7066 (2019 Registration Application). *Jones*, 462 F. Supp. 3d at 1196.

98.    After trial in 2020, this Court ruled in Plaintiffs' favor on those claims, finding the pay-to-vote system unconstitutional and concluding that the 2019 Registration Application violated the NVRA. *Id.* at 1249–50.

99.    On appeal, the Eleventh Circuit reversed this Court's holding that the pay-to-vote scheme is unconstitutional but left this Court's detailed factual findings undisturbed. *Jones*, 975 F.3d at 1049.

100.    The defendants did not appeal the NVRA ruling.

101.    This Court held that the 2019 Registration Application, adopted after passage of SB 7066, violated the NVRA in that it required applicants to disclose more information about their felony convictions than necessary. *See Jones*, 462 F. Supp. 3d at 1244–45 ("The new form thus runs afoul of the NVRA's mandate that a voter registration form require only such identifying and other information 'as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process.'") (*quoting* 52 U.S.C. § 20508(b)(1)).

102.    This Court also held that the 2019 Registration Application was "objectionable" because it contained cryptic language unlikely to be understood by applicants. *Id.* ("[F]ew if any registrants are likely to know that Amendment 4 is now

's. 4, Art. VI' of the State Constitution.").

103.   Despite the fact that the 2019 Registration Application contained multiple, unnecessary "checkboxes," these boxes did not account for the eligibility statuses of all types of applicants, leaving some individuals with "no box to check." *Id.*

104.   For the foregoing reasons, this Court in *Jones v. DeSantis* enjoined the defendants there from using the 2019 Registration Application. *Id.* at 1251.

105.   In response to the injunction, Florida reverted to the registration application that it had used prior to the enactment of SB 7066, the Application at issue here.

106.   Florida originally started using the Application in 2013.

107.   Because the Application was created in or about 2013, it does not account for Amendment 4 or SB 7066.

108.   Since enacting its pay-to-vote system, Florida and Florida counties have proven unable to timely verify the eligibility of registered voters with felony convictions.

109.   There are no reliable, publicly available sources for determining whether a returning citizen owes money or whether a returning citizen's debts disqualify him or her from voting.

110.   DOS and the Florida Department of Law Enforcement (FDLE)—state

agencies charged with identifying potentially ineligible voters whose voting rights have not been restored so that they can be removed from the rolls—have failed to satisfy this legal duty for years, leaving voters who may or may not be eligible on the voter rolls without informing them as to their eligibility status. Fla. Stat. §§ 98.075(5) (requiring DOS to "identify those registered voters who have been convicted of a felony and whose voting rights have not been restored"), 98.0751(3)(a), 98.093(2)(d) (requiring FDLE to "identify those persons who have been convicted of a felony who appear in the voter registration records supplied by the statewide voter registration system"); *see also id*. § 98.093(2)(e)–(f).

> **D.    Florida's Inadequate Voter Registration Application Exposes Returning Citizens to Prosecution for Voting-Related Crimes Based on Honest Mistakes About Their Eligibility.**

111.    Rather than fix the broken voter-registration system that it created, the State investigates and prosecutes returning citizens who registered or voted based on an honest but mistaken belief that they were eligible.

112.    In 2022, operating from the baseless premise that voter fraud is widespread in Florida's elections, Governor DeSantis called for the creation of an unnecessary election-security office to investigate "election irregularities."

113.    The Florida Legislature created the Office of Election Crimes and Security (OECS) and housed it in DOS.

114.    On August 18, 2022, just five days before the State's primary election,

OECS partnered with FDLE and local police to conduct highly publicized arrests of 20 returning citizens for allegedly voting while ineligible more than two years earlier.

115.   At a campaign-style press conference held at a Broward County courthouse, Governor DeSantis, flanked by more than a dozen uniformed law enforcement officers, heralded the arrests as the "opening salvo" and not the "sum total."

116.   Governor DeSantis announced that he had tapped OSP to prosecute the returning citizens who were arrested because "people weren't getting prosecuted" by state attorneys.

117.   OSP charged the returning citizens arrested in August with violations of either or both of two criminal statutes, Fla. Stat. §§ 104.011(1) and 104.15.

118.   Fla. Stat. § 104.011(1) is titled "False swearing" and provides:

> A person who willfully swears or affirms falsely to any oath or affirmation, or willfully procures another person to swear or affirm falsely to an oath or affirmation, in connection with or arising out of voting or elections commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

119.   Fla. Stat. § 104.15 is titled "Unqualified electors willfully voting" and provides:

> Whoever, knowing he or she is not a qualified elector, willfully votes at any election is guilty of a felony of the third degree, punishable as provided in s. 775.082, s.

775.083, or s. 775.084.

120.   To obtain a conviction for false swearing under Section 104.011(1) or for unqualified electors willfully voting under Section 104.15, the State must prove that the action was "willful"; that is, the defendant knew he or she was ineligible to register or vote but did so anyway.

121.   On information and belief, most, if not all, of the returning citizens charged did not know that they were ineligible when they registered or voted.

122.   Video footage from their August arrests has a unifying theme: utter shock and confusion. These individuals appear to have had no idea that they were not eligible to register or vote.

123.   Former State Senator Jeffrey P. Brandes—a sponsor of SB 7066—was disturbed by the arrests.

124.   Referring to SB 7066, former Sen. Brandes explained:

> The way that we drafted the law was to say that if you were going to be arrested for [voting], the state had to prove that you did it willingly. Willingly means you had either knowledge or intent[.] . . . What we found with these videos, I think so far, every single case of the 20 individuals is that none of them has said, I intended to do this, right.

Emerald Morrow, *Inside Florida's Voter Fraud Arrests—And The System That Allowed Them to Happen*, WTSP-TV (Nov. 7, 2022), https://www.wtsp.com/article/news/investigations/10-investigates/broken-ballots-floridas-voter-fraud-arrests-

show-cracks-election-system/67-d1aeb89f-cfb4-428a-a48c-a0ea10af9e68.

125.   Citing confusion among those arrested, former Sen. Brandes condemned the "fundamental unfairness of these arrests." *Id.*

126.   Last year, Bill Gladson, the State Attorney for Florida's Fifth Judicial Circuit, also declined to prosecute six returning citizens in Lake County who allegedly voted while ineligible in 2020 because "[t]he evidence fail[ed] to show willful actions[.]" Memorandum from Jonathan Olson, Div. Supervisor, Office of State Att'y, Fifth Judicial Circuit (June 13, 2022), [https://tinyurl.com/ys3r67h6]. Those individuals, like the returning citizens charged by the OSP, were given voter information cards, were never notified they were ineligible, and "were encouraged to vote by various mailings and misinformation." *Id.*

127.   It is not surprising that those arrested as part of OECS's "opening salvo" lacked the requisite *mens rea* given the widespread confusion among election officials and prospective voters with past convictions about voter eligibility after a conviction in Florida.

128.   Florida does not make available any centralized database to returning citizens who want to look up their voter eligibility or status.

129.   Most, if not all, of those who were arrested received a voter information card in the mail. Fla. Stat. § 97.071(1).

130.   Florida Supervisors of Elections (SOEs) mail a voter information card

to each newly registered voter whose Application is complete if the State has confirmed that the registrant is a real person. Fla. Stat. §§ 97.053(2), (6), 97.071.

131.   In addition, despite having registered to vote in 2019 or early 2020, several of those charged were not informed until they were arrested in 2022 of the State's allegation of their ineligibility to vote.

132.   Based on public reporting, several of the arrested individuals were advised to register or vote by Florida government officials.

133.   For example, based on publicly available information:

a) Three men—John Boyd Rivers, Dedrick Baldwin, and Kevin Bolton—were registered to vote by a representative from the Alachua County SOE as part of the county's outreach campaign at local jails aimed at informing incarcerated Floridians that their voting rights had been restored.

b) Upon hearing on the news that individuals with felony convictions had been granted the right to vote, Jerry Lee Foster called the Orange County Sheriff's Office and asked if he was, in fact, eligible to vote. A deputy told him that he was. He explained to the officers investigating his case that when he filled out his voter-registration application, he believed his right to vote had been restored.

c) Douglas Oliver was approached by a canvasser while shopping. Oliver disclosed his felony conviction to the canvasser, who told him he was eligible nonetheless. Oliver then took the additional step of calling his local election office to confirm that he could cast a ballot, despite having been convicted of a sexual offense. The election official told him he was eligible.

134.   Faced with clear evidence that returning citizens are confused or misinformed about their eligibility, Defendant and the State have done nothing.

135.   State officials are planning further voter investigations and prosecutions of returning citizens rather than, for example, providing the necessary information

on the Application to enable applicants to complete it accurately, or creating a centralized database that would enable returning citizens to verify their eligibility.

136.   On October 14, 2022, DOS and OECS submitted a legislative budget request for the 2023–24 fiscal year, seeking $2,285,837 in funding and 27 full-time positions.

137.   On February 15, 2023, Governor DeSantis signed into law Senate Bill 4-B (SB 4-B), which purports to expand OSP's authority to prosecute alleged voter fraud identified by OECS. Laws of Fla. ch. 2023-2 (SB 4-B) (amending Fla. Stat. § 16.56(1)).

138.   Florida lawmakers introduced and passed SB 4-B during a special legislative session after judges in Broward, Miami-Dade, and Orange counties dismissed four of OSP's cases against returning citizens arrested in August 2022. The state courts concluded that OSP lacked authority to prosecute alleged misconduct that did not occur in more than one judicial circuit.

139.   The effort to expand OSP authority under SB 4-B, DOS's and OECS's request for additional funding and staff, and the statements from Defendant Byrd and Governor DeSantis show that DOS, OECS, FDLE, and OSP plan to redouble their efforts to prosecute honest mistakes by returning citizens in the future, even where local prosecutors have declined to prosecute.

140.   In addition, days after OECS's "opening salvo," the Florida Department

of Corrections (DOC) revised its "Instructions to the Offender," a form for Floridians on probation, to place the burden on returning citizens to determine if they are eligible to vote.

141.   The new language in the "Instructions to the Offender" states, in pertinent part:

> By signing this letter, you agree that you alone are solely responsible for determining if you are legally able to register to vote, and that you must solely determine if you are lawfully qualified to vote. If someone tells you that you are eligible to vote, you must rely upon your own independent knowledge (as informed by your own attorney if applicable) of your individual circumstances, and not upon the advice of any third parties who may be incorrect or unqualified to interpret your eligibility.

*See* Lawrence Mower, *After voter fraud arrests, Florida issues new forms that could bolster future cases*, TAMPA BAY TIMES (Oct. 31, 2022), https://www.tampabay.com/news/florida-politics/2022/10/31/desantis-probation-voter-fraud-form-felons-eligibility/.

142.   The State is trying to lay an even heavier burden on returning citizens to determine their own eligibility. But the Application undermines their ability to meet that burden and Plaintiffs' ability to assist them in doing so.

143.   Despite the State's statutorily prescribed role in determining eligibility and its refusal to educate citizens about how to navigate its labyrinth of voter-eligibility rules, the new DOC form purports to place the onus on returning citizens,

even when they receive information from government officials stating or appearing to confirm that they are eligible to vote.

144.   Now, more than ever, returning citizens need a voter-registration application that accurately conveys Florida's voting eligibility criteria.

### E.   The Application and Application Process.

145.   To register to vote in Florida, an individual must first obtain a voter registration application in hard copy or online. *See* Fla. Stat. §§ 97.052, 97.0525. The current mail-in version—the Application (**Exhibit 1**)—is used statewide and is labeled DS-DE 39. An individual can also register through the Department of Highway Safety and Motor Vehicles; the content of the mail-in form dictates the content of the form that the Department of Highway Safety and Motor Vehicles must use. *See* Fla. Stat. § 97.057(3)(a). And an individual can also register online. The online application process "includes the information required for the uniform statewide voter registration application." Fla. Stat. § 97.0525(2)(b). The Application thus determines the content of voter registration interactions in Florida.

146.   The Application states that "[i]f you have been convicted of a felony . . . you cannot register until your right to vote has been restored."

147.   The Application also requires applicants to affirm: "I am not a convicted felon, or if I am, my right to vote has been restored."



148.   The Application *does* specify other voter eligibility requirements: that to register to vote in Florida, an applicant must be a U.S. citizen, a Florida resident, and at least 18 years old.

149.   When detailing these other voter-eligibility requirements, the Application does not present vague phrasing that would require an applicant to look elsewhere to understand the eligibility requirements. For example, the Application does not say that, to register to vote, the applicant must be "of voting age," "have the citizenship required to have the right to vote," or that the applicant must be "not born outside of the U.S., or if I am, I have been naturalized as a U.S. citizen."

150.   During the application process, the applicant also must affirm, subject to criminal penalties for submitting false information: "I am not a convicted felon, or if I am, my right to vote has been restored."

151.   Florida's 67 SOEs are required to accept voter-registration applications from all applicants and must determine whether applicants are eligible. Fla. Stat.

§§ 97.053(1), 98.045(1).

152.   A voter registration application is complete, and should be approved, (1) when "all information necessary to establish the applicant's eligibility pursuant to s. 97.041 is received by a voter registration official," and (2) when the authenticity of certain specified information is "verified." *Id.* § 97.053(2), (6).

153.   All voter-registration applications received by a voter registration official must be entered into the statewide registration system within 13 days of receipt, at which point it "shall be immediately forwarded to the appropriate supervisor of elections." *Id.* § 97.053(7).

154.   Upon receipt of a voter-registration application, the SOE "must notify [the] applicant of the disposition of the . . . application within 5 business days after voter registration information is entered into the statewide voter registration system." *Id.* § 97.073(1).

155.   The SOE's notification "must inform the applicant that the application has been approved, is incomplete, has been denied, or is a duplicate of a current registration." *Id.*

156.   The mailing of a voter-information card "constitutes notice of approval of registration." *Id.*

157.   A voter-registration application can only be accepted as valid after DOS, in conjunction with the Florida Department of Highway Safety and Motor

Vehicles, has verified "that the applicant is a real, living person." *See* Decl. of Maria Matthews ¶ 10, *Jones v. DeSantis*, No. 4:19-cv-300-RH/MJF (Sep. 6, 2019), ECF No. 148-16.

158.   DOS does not verify the "truth or accuracy of the felon affirmation(s) before registering the applicant to vote." *Id.*

159.   Once registered, a voter may be removed from the voter roll "upon a determination the voter is ineligible due to a prior felony conviction without restoration of voting rights." *Id.* ¶ 11.

160.   DOS is tasked with "identify[ing] those registered voters who have been convicted of a felony and whose voting rights have not been restored by comparing information received from a variety of sources including the Clerks of the Circuit Court, the Board of Executive Clemency, the Florida Department of Corrections, the Florida Department of Law Enforcement, or a United States Attorney's office." *Id.*

**F.     The NVRA Mandates that State Voter Registration Applications Inform Returning Citizens of the Eligibility Requirements to Vote.**

161.   Congress passed the NVRA because the right "to vote is a fundamental right" and "it is the duty of the Federal, State, and local governments to promote the exercise of that right." 52 U.S.C. § 20501(a)(1)–(2).

162.   Congress found that "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections

for Federal office and disproportionately harm voter participation by various groups, including racial minorities." *Id.* § 20501(a)(3).

163.   The stated goals of the NVRA are to increase voter registration, enhance voter participation, protect the integrity of the electoral process, and ensure accurate and current voter-list maintenance. *Id.* § 20501(b).

164.   To that end, the statute requires states to "inform applicants . . . of [] voter eligibility requirements," whether registrants apply via the federal mail-in voter registration form, a state mail-in form, a state's department of motor vehicles, or any other state agency tasked with carrying out the NVRA. *Id.* § 20507(a)(5); *see id.* §§ 20504(c)(2)(D), 20508(b)(4)(i).

165.   State mail-in registration forms for federal elections must "include a statement that [] specifies each eligibility requirement." *Id.* §§ 20508(b)(2)(A), 20505(a)(2).

166.   The purpose of the NVRA's requirement that the Application specify the eligibility requirements was to avoid ineligible applicants' registration. *See, e.g.*, S. Rep. No. 102-60, 102nd Cong., 1st Sess., at 23 (1991); 138 Cong. Rec. H4702-41 (daily ed. June 16, 1992). Florida's Application fails to accomplish this goal.

167.   The Application does not comply with these statutory mandates because it does not specify each eligibility requirement or inform applicants of the eligibility requirements.

### G.   Florida's Uniform Statewide Voter Registration Application Does Not Specify Voter Eligibility Requirements or Inform Voters of the Requirements.

168.   With respect to returning citizens, the Application says only that "[i]f you have been convicted of a felony . . . you cannot register until your right to vote has been restored."

169.   The Application does not specify—indeed, it provides *no indication whatsoever*—that different eligibility requirements apply to individuals convicted of different types of offenses or that different eligibility requirements apply depending on the terms of sentence or court of conviction.

170.   ***First***, the Application does not specify the eligibility requirements applicable to individuals convicted of murder or a felony sexual offense in Florida.

171.   Notably, the Application does not inform applicants convicted of murder or a felony sexual offense in Florida that, under Amendment 4 and SB 7066, they are not eligible to vote unless they have received restoration of their rights through the clemency process. *See* FLA. CONST. art. VI, § 4(b) ("No person convicted of murder or a felony sexual offense shall be qualified to vote until restoration of civil rights."); Fla. Stat. § 98.0751(2)(b) (defining the phrase "felony sexual offense" in Amendment 4), (c) (defining the term "murder" in Amendment 4).

172.   ***Second***, the Application does not specify the eligibility requirements applicable to those convicted of felonies in Florida not involving murder or a sexual

offense.

173.   The Application does not inform applicants convicted of felonies in Florida not involving murder or a felony sexual offense that, under Amendment 4, to have their rights restored automatically, they must have completed "all terms of sentence, including probation and parole." *See* FLA. CONST. art. VI, § 4(a).

174.   Nor does the Application inform applicants convicted of felonies in Florida not involving murder or a felony sexual offense that, under SB 7066, to have their rights restored automatically they must have been released from any term of community control ordered by a court as part of their sentence and have paid certain LFOs, including all fines, fees, costs, and restitution within the "four corners" of their "sentencing document." *See* Fla. Stat. § 98.0751.

175.   ***Third***, the Application does not specify the eligibility requirements applicable to those convicted of out-of-state felonies.

176.   The Application does not inform applicants that "persons convicted of felonies outside of Florida whose voting rights were restored by the state wherein the felony was committed, may register to vote in Florida." *Dep't of State Advisory Op. 04-05* (May 27, 2004) ("No evidence of the civil rights restoration is required at the time of registration.").

177.   Nor does the Application inform applicants who were convicted of felonies outside Florida that a "felony conviction in another state makes a person

ineligible to vote in Florida only if the conviction would make the person ineligible to vote in the state where the person was convicted." *Constitutional Amendment 4/Felon Voting Rights*, FLA. DIV. OF ELECTIONS, https://dos.myflorida.com/elections/for-voters/voter-registration/constitutional-amendment-4felon-voting-rights/.

178.   In addition, as discussed above, Florida SOEs send a voter-information card to each newly-registered voter, including registrants whom they later determine to be ineligible at the time they registered because their voting rights were not restored after a felony conviction, so long as the application is complete and the State has confirmed the voter's identity. *See* Fla. Stat. § 97.071.

179.   Florida's voter information card does not include *any information* to indicate to registrants that they might not be eligible to vote.

## H.   Florida's Uniform Statewide Voter Registration Application Chills Voter Registration.

180.   The Application contravenes the NVRA's purpose of "increas[ing] the number of eligible citizens who register to vote in elections for Federal office." 52 U.S.C. § 20501(b)(1).

181.   Plaintiffs are chilled from engaging in voter registration and GOTV activities because they are concerned about exposing returning citizens and themselves to criminal liability based on confusion around accurately completing the Application. These concerns are heightened due to the State's ongoing investigations, arrests, and prosecutions of returning citizens who registered to vote

based on good-faith beliefs of their eligibility.

182.   Returning citizens who are not chilled from registering and voting are exposed to the risk of prosecution and criminal penalties despite honestly mistaking their eligibility.

## IV.  CLAIM FOR RELIEF

### COUNT ONE

**Violation of the National Voter Registration Act
(52 U.S.C. § 20501 *et seq.*; 42 U.S.C. § 1983)**

183.   Plaintiffs re-allege and incorporate by reference each allegation contained in the preceding paragraphs as though fully set forth herein.

184.   Florida's voter registration Application does not specify *any* specific eligibility requirements related to prior criminal convictions.

185.   The Application provides only that "[i]f you have been convicted of a felony . . . you cannot register until your right to vote has been restored."

186.   The Application also requires applicants to check a box stating "I affirm that I am not a convicted felon, or if I am, my right to vote has been restored."

187.   But the Application does not provide any explanation as to when an individual's "right to vote has been restored," or any guidance for a voter seeking to make that determination.

188.   The Application fails to inform voters that the eligibility requirements differ depending on a returning citizen's conviction, the state of conviction, and the

sentence received.

189.   The Application does not "specify" "each eligibility requirement." *See* 52 U.S.C. §§ 20508(b)(2)(A), 20505(a)(2).

190.   The Application does not specify that for most felonies in Florida, returning citizens' rights are automatically restored upon completion of all terms of their sentence, including probation, parole, community control, and payment of certain legal financial obligations.

191.   The Application does not specify that returning citizens convicted of murder or sexual offenses in Florida can only have their rights restored through the clemency process.

192.   The Application does not specify that the restoration of the voting rights of returning citizens convicted of felonies in states other than Florida depend upon their eligibility under the law of the state of conviction.

193.   Defendant is aware of these violations. On January 13, 2023, Plaintiffs served a 90-day notice letter pursuant to 52 U.S.C. § 20510(b)(2) on Defendant.

194.   As of the date of this Complaint, more than 90 days since Plaintiffs sent the letter, the violations Plaintiffs identified have not been cured.

195.   Plaintiffs have diverted significant organizational resources to informing returning citizens of the eligibility requirements that are not communicated by the Application.

196. Plaintiffs and the communities they protect are aggrieved by Defendant's past and continuing violations of the NVRA and have no adequate remedy at law.

197. Declaratory and injunctive relief are required to remedy Defendant's past and continuing violations of the NVRA and to ensure Defendant's future compliance with the NVRA.

## V.  PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their favor and:

A. Declare that the State's uniform statewide voter registration application violates the NVRA, 52 U.S.C. § 20501 *et seq.*;

B. Enjoin Defendant from publishing the current, illegal Application (**Exhibit 1**) and from requiring voter registration applicants to complete it;

C. Direct Defendant to prepare, publish, and use an application that:

    i. Informs individuals convicted of a statutorily enumerated murder or felony sexual offenses in Florida that they are not eligible to vote unless they have had their right to vote restored through the clemency process;

    ii. Informs individuals convicted of felonies in Florida not involving a murder or felony sexual offense that they are eligible to vote if they completed all terms of sentence, including probation, parole, and

community control, and have paid disqualifying legal financial obligations;

   iii.   Informs individuals convicted of felonies in another state that they are eligible to vote in Florida if their conviction did not result in their losing their voting rights in the other state, or if their voting rights were restored in the other state;

D. Direct Defendant to convey the revised application and its content to Florida's Department of Highway Safety and Motor Vehicles, so that the latter may develop a "voter registration application that is the same in content, format, and size as the uniform statewide voter registration application prescribed under s. 97.052," Fla. Stat. § 97.057(3)(a);

E. Award Plaintiffs costs, disbursements, and reasonable attorneys' fees incurred in bringing this action pursuant to 52 U.S.C. § 20510(c); and

F. Grant such other and further relief as the Court deems just and proper.

Respectfully submitted this 26th day of April, 2023,

 */s/ Nicholas L.V. Warren*

| | |
|---|---|
| Caroline A. McNamara (FBN 1038312) | Eliza Sweren-Becker* |
| Daniel B. Tilley (FBN 102882) | Patrick A. Berry* |
| **ACLU Foundation of Florida, Inc.** | Sara D. Carter* |
| 4343 West Flagler Street, Suite 400 | Sean Morales-Doyle* |
| Miami, FL 33134 | **Brennan Center for Justice** |
| (786) 363-2714 | **at NYU School of Law** |

dtilley@aclufl.org
cmcnamara@aclufl.org

Nicholas L.V. Warren (FBN 1019018)
**ACLU Foundation of Florida. Inc.**
336 East College Avenue, Suite 203
Tallahassee, FL 32301
(786) 363-1769
nwarren@aclufl.org

Andrew Frackman*
William Pollak*
Colleen Powers*
Kevin Koai*
**O'Melveny & Myers LLP**
7 Times Square
New York, NY 10036
(212) 326-2000
afrackman@omm.com
wpollak@omm.com
cpowers@omm.com
kkoai@omm.com

Brian P. Quinn*
Patrick Jones*
Emily Murphy*
**O'Melveny & Myers LLP**
1625 Eye Street NW
Washington, DC 20006
(202) 383-5300
bquinn@omm.com
pjones@omm.com
emurphy@omm.com

120 Broadway, Suite 1750
New York, NY 10271
(646) 292-8301
morales-doyles@brennan.law.nyu.edu
sweren-beckere@brennan.law.nyu.edu
berryp@brennan.law.nyu.edu
carters@brennan.law.nyu.edu

Leah C. Aden*
John S. Cusick*
Victor Genecin*
**NAACP Legal Defense and
Educational Fund, Inc.**
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
laden@naacpldf.org
jcusick@naacpldf.org
vgenecin@naacpldf.org

Julie A. Ebenstein (FBN 91033)
Jonathan Topaz*
Casey Smith*
Sophia Lin Lakin*
**American Civil Liberties Union, Inc.**
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
jebenstein@aclu.org
jtopaz@aclu.org
csmith@aclu.org
slakin@aclu.org

*\* Pro hac vice applications forthcoming*

*Counsel for Plaintiffs*